No. 25-50675

# In the United States Court of Appeals for the Fifth Circuit

TAMI BARRIER,
*Plaintiff–Appellant,*

v.

UNITED STATES OF AMERICA,
*Defendant–Appellee.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division
Case No. 2:23-CV-58-AM-JAC

## BRIEF FOR APPELLANT TAMI BARRIER

Dustin R. Burrows
Ted A. Liggett
LIGGETT LAW GROUP, P.C.
3217 34th Street
Lubbock, Texas 79410
T: (806) 744-4878
F: (806) 744-4879

George M. Padis
Griffin S. Rubin
SBAITI & COMPANY PLLC
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
E: george.padis@sbaitilaw.com

*Counsel for Plaintiff–Appellant Tami Barrier*

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Appellant:**   Tami Barrier

**Counsel for Appellants:**   Sbaiti & Company PLLC
George M. Padis (george.padis@sbaitilaw.com)
Griffin S. Rubin (gsr@sbaitilaw.com)

Liggett Law Group, P.C.
Dustin R. Burrows (dustin@liggettlawgroup.com)
Ted A. Liggett (ted@liggettlawgroup.com)

**Appellee:**   United States of America

**Counsel for Appellee:**   U.S. Attorney's Office, Western District of Texas
Darryl S. Vereen (darryl.vereen@usdoj.gov)

**Other:**   Roberto Duran

*/s/ George M. Padis*
George M. Padis

*Counsel of Record for Plaintiff–Appellant
Tami Barrier*

i

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff–Appellant Tami Barrier requests oral argument. This appeal arises from the grant of summary judgment on a peculiar record. The issue presented is a novel, unsettled question of federal law stemming from the understanding and interpretation of state law. Oral argument will, therefore, materially aid the Court's decisional process by allowing discussion of the record, caselaw, and the practical consequences of the proffered interpretations. In addition, the question presented may have significant implications for federal law enforcement operations along the United States' southern border with Mexico and could expose Border Patrol agents and other members of federal law enforcement to increased risk of personal liability. The opportunity to address the Court's questions in real time will promote clarity on these matters of first impression and ensure that any rule announced is workable and consistent with both state law and federal statutory design.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ........................................................... ii

Jurisdictional Statement ............................................................................. 1

Statement of the Issues ............................................................................... 2

Statement of the Case ................................................................................. 3

    1.    In Agent Duran's Dual Role as a Federal Employee and a Union Official, Most of His Time Is Spent on Union Activities. ......................................... 3

    2.    In the Days Before the Incident, the Union President Directs Agent Duran to Collect Donated Supplies and Refreshments............................... 5

    3.    Agent Duran, Running Late, Rushes to the Union Hall, Strikes Barrier with His Truck Exiting the Station, and Takes Off. ...................................... 6

    4.    The Police and Border Patrol Supervisors Call Agent Duran Back to the Station for Questioning; After the "Brass" Huddle, They Decide Agent Duran's Conduct Was "Off Duty." ............................................................. 8

    5.    The District Court Grants the Government's Motion for Summary Judgment, Finding That No Reasonable Factfinder Could Conclude Agent Durant Was Acting Within Scope....................................................... 9

Summary of the Argument ......................................................................... 10

Standard of Review..................................................................................... 12

Argument .................................................................................................... 13

    1.    A Reasonable Factfinder Could Conclude that Agent Duran's Mid-Pandemic Errand to Collect Hand Sanitizer, Drinks, and Snacks to Distribute to Border Patrol Stations Across the Region Furthered the Border Patrol's Mission. ............................................................................ 14

2.    In Finding that Agent Duran "Was Not Compensated for His Trip," the District Court Erroneously Resolved Fact Disputes in the Movant's Favor..................................................................................... 19

3.    The District Court's Conclusion that "Union Activities Are Personal" Is Inconsistent with Texas Law and Persuasive Authority. ........................... 23

    a.    The Government's and the district court's categorical approach is inconsistent with Texas's objective, functional approach. ............... 24

    b.    Persuasive authority indicates that union activities to further an employer's interests are within scope. ........................................... 29

4.    The District Court's "Representational"-Conduct Reasoning Was Not Raised by the Parties and Depends on Facts Outside the Record. ............. 32

5.    A Decision Affirming the District Court's Restrictive View of the Scope of Employment Would Expose Federal Law Enforcement to Increased Risk of Personal Liability........................................................................ 35

Conclusion ............................................................................................................. 36

Certificate of Service ............................................................................................ 38

Certificate of Compliance ..................................................................................... 39

# TABLE OF AUTHORITIES

*Am. Cas. Co. of Reading, Pa. v. Bushman*,
  480 S.W.3d 667 (Tex. App.—San Antonio 2015, no pet.) .................................. 15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................ 12

*Anderson v. Valdez*,
  845 F.3d 580 (5th Cir. 2016) .................................................................... 14, 29

*Arbelaez v. Just Brakes Corp.*,
  149 S.W.3d 717 (Tex. App.—Austin 2004, no pet.) ........................................ 17

*Auciello Iron Works, Inc. v. NLRB*,
  517 U.S. 781 (1996) ........................................................................................ 27

*Bodin v. Vagshenian*,
  462 F.3d 481 (5th Cir. 2006) ..................................................................... 12, 13

*Borneman v. United States*,
  213 F.3d 819 (4th Cir. 2000) ......................................................................... 14

*Carter v. United States*,
  982 F.2d 1141 (7th Cir. 1992) ........................................................................ 29

*Castro v. United States*,
  540 U.S. 375 (2003) ........................................................................................ 32

*Caterpillar Tractor Co. v. Shook*,
  313 N.W.2d 503 (Iowa 1981) ......................................................................... 29

*Celestine v. Mount Vernon Neighborhood Health Ctr.*,
  403 F.3d 76 (2d Cir. 2005) ............................................................................. 35

*Chevron, U.S.A., Inc. v. Lee*,
   847 S.W.2d 354 (Tex. App.—El Paso 1993, no writ)..........................................15

*City of Round Rock v. Rodriguez*,
   399 S.W.3d 130 (Tex. 2013).................................................................29

*Cory v. Stewart*,
   103 F.4th 1067 (5th Cir. 2024) ......................................................20, 23

*Crittindon v. LeBlanc*,
   37 F.4th 177 (5th Cir. 2022) ................................................................33

*D & J Invs. of Cenla, L.L.C. v. Baker Hughes, a GE Co., L.L.C.*,
   52 F.4th 187 (5th Cir. 2022) ................................................................33

*De Arrellano v. State Farm Fire & Cas. Co.*,
   191 S.W.3d 852 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ....................14

*Dep't of Just. v. FLRA*,
   144 F.3d 90 (D.C. Cir. 1998) ................................................................27

*Dictaphone Corp. v. Torrealba*,
   520 S.W.2d 869 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.) .......25

*Fantasia v. Hess Oil & Chem. Corp.*,
   265 A.2d 565 (Bergen County Ct. 1970)..................................................... 31, 32

*Garcia v. United States*,
   88 F.3d 318 (5th Cir. 1996)................................................................. 12, 14

*Garnett v. Remedi Seniorcare of Va., LLC*,
   892 F.3d 140 (4th Cir. 2018) ................................................................36

*Greenlaw v. United States*,
   554 U.S. 237 (2008).................................................................33

*In re La. Crawfish Producers*,
  852 F.3d 456 (5th Cir. 2017) ............................................................. 12, 19

*Janak v. Tex. Emp. Ins. Ass'n*,
  381 S.W.2d 176 (Tex. 1964) .......................................................... 16, 17, 25

*Jones v. Hartford Acc. & Indem. Co.*,
  811 S.W.2d 516 (Tenn. 1991) ................................................................30

*Kearns v. United States*,
  23 F.4th 807 (8th Cir. 2022) ..................................................................14

*Kennedy v. Thompson Lumber Co.*,
  26 N.W.2d 459 (Minn. 1947)...................................................................30

*Kipps v. Caillier*,
  197 F.3d 765 (5th Cir. 1999)...................................................................12

*Knipe v. Texas Emp. Ins. Ass'n*,
  234 S.W.2d 274 (Tex. App.—Eastland 1950, pet. granted)..............................25

*Liberty Mut. Ins. Co. v. Nelson*,
  178 S.W.2d 514 (Tex. 1944) ......................................................... 14, 16, 17, 18

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)...............................................................................33

*M.D.C.G. v. United States*,
  956 F.3d 762 (5th Cir. 2020) ..................................................................12

*Mikkelsen v. N. L. Indus.*,
  370 A.2d 5 (N.J. 1977) ...........................................................................30

*Mitchell v. Carlson*,
  896 F.2d 128 (5th Cir. 1990) ..................................................................35

*New England Tel. Co. v. Ames*,
474 A.2d 571 (N.H. 1984) ................................................................30

*Pac. Indem. Co. v. Indus. Acc. Comm'n*,
81 P.2d 572 (Cal. Ct. App. 1938) ................................................... 31

*Painter v. Amerimex Drilling I, Ltd.*,
561 S.W.3d 125 (Tex. 2018) ................................................ 14, 15, 18

*Parker & Parsley Petrol. Co. v. Dresser Indus.*,
972 F.2d 580 (5th Cir. 1992) ..........................................................24

*Perez v. Workers' Comp. Appeals Bd.*,
199 Cal. Rptr. 280 (Cal. Ct. App. 1984) .........................................30

*Simmons v. Himmelreich*,
578 U.S. 621 (2016) .......................................................................35

*Spatafore v. Yale Univ.*,
684 A.2d 1155 (Conn. 1996).........................................………30

*Stanley v. City of Sanford*,
606 U.S. 46 (2025) .........................................................................34

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......................................................................32

*United States v. Singh*,
518 F.3d 236 (4th Cir. 2008) ..........................................................25

*Universal Cyclops Steel Corp. v. Workmen's Comp. Appeal Bd.*,
305 A.2d 757 (Pa. Commw. Ct. 1973)............................................. 31

## STATUTES

5 U.S.C. § 7101(b) ...........................................................................27

5 U.S.C. § 7131(d) ...........................................................................34

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1346(b)(1) ...................................................................1, 13

## RULES

FED. R. CIV. P. 56(a).........................................................................12

## OTHER AUTHORITIES

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Civil Pattern Jury Charges: General Negligence, Intentional Personal Torts, and Worker's Compensation* (2022) ......................................................................... 13

H.R. Rep. No. 95-1717 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2860...............................................................27

OFF. OF BORDER PATROL HEALTH, TEX. HEALTH & HUM. SERVS., TEXAS BORDER HEALTH DATA OVERVIEW (Oct. 11, 2023), https://www.dshs.texas.gov/sites/default/files/borderhealth/TFBHO-Docs/handouts/Texas-Border-Health-Data-Overview-10-11-2023.pdf.................3

RESTATEMENT (SECOND) OF AGENCY (AM. L. INST. 1958)....................26

RESTATEMENT (THIRD) OF AGENCY (AM. L. INST. 2006)................ 14, 29

## Jurisdictional Statement

This is an appeal from the district court's order granting summary judgment in favor of Defendant–Appellee the United States, finding that no reasonable factfinder could conclude that the federal employee in question was acting in the scope of employment under the Federal Tort Claims Act. ROA.463. The district court had subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1) because it has jurisdiction over civil claims against the United States seeking money damages for certain personal injuries or property damage caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States.

The district court entered final judgment in favor of the United States on June 18, 2025, ROA.464, and Plaintiff–Appellant Tami Barrier timely filed a notice of appeal on August 14, 2025, ROA.465-466. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Under Texas law, an employer is liable for an employee's conduct that furthers the interests of the employer. Agent Duran struck Plaintiff–Appellant Tami Barrier with his truck while exiting a Border Patrol station on the way to collect donated supplies and refreshments to distribute to other stations. Was Agent Duran within the scope of employment?

## STATEMENT OF THE CASE

Roberto Duran is employed as an agent with United States Customs and Border Protection (the "Border Patrol" or "CBP"). He is stationed in the Del Rio sector, home to one of the eleven major ports of entry within Texas for border crossings into the United States.[1]

Agent Duran also serves as the executive vice president and lead steward of the local sector of the National Border Patrol Council (the "NBPC"), the sole union Border Patrol agents may join under the Federal Service Labor–Management Relations Statute (the "FSLMRS"). In that role, Agent Duran is "in charge" of the sector union's "day-to-day operations." ROA.316.

1. **In Agent Duran's Dual Role as a Federal Employee and a Union Official, Most of His Time Is Spent on Union Activities.**

Agent Durant's full salary is paid by the CBP even though he spends forty hours per week on union work—an arrangement that may seem counterintuitive to those unfamiliar with federal-sector labor relations. Under the FSLMRS, negotiated-for individuals, like Agent Duran, may perform union-related functions while on the clock with the agency that employs them. *See* ROA.331-332. Under this arrangement, the

---

[1] *See* OFF. OF BORDER PATROL HEALTH, TEX. HEALTH & HUM. SERVS., TEXAS BORDER HEALTH DATA OVERVIEW 15–16 (Oct. 11, 2023), https://www.dshs.texas.gov/sites/default/files/borderhealth/TFBHO-Docs/handouts/Texas-Border-Health-Data-Overview-10-11-2023.pdf.

3

Border Patrol sets the general parameters of his schedule: Agent Duran typically works forty hours conducting union-related business and ten hours per week (or two hours per workday) performing standard agency functions for which he received overtime pay. ROA.326.

But those terms are flexible; Agent Duran has "a lot of discretion" in determining when he works those hours in each day. ROA.204. In other words, Agent Duran sets his own hours. *See* ROA.324-325. Agent Duran's workday typically starts at 6:00 am, frequently at home. ROA.205, 219.

Agent Duran enters his time and attendance electronically based on notes and memory on a government website on the Friday before the end of each biweekly pay period. ROA.216-218. Nobody audits Agent Duran's time to ensure that he truly worked the union hours that he claims he does. ROA.325. There is no daily "punch clock" for Duran's union hours with granular times, like 4:11 pm. *See* ROA.211-212, 342-343, 350-352. Instead, the emphasis is on affirming that Agent Duran worked the required hours over the course of the pay period rather than recording exact start/stop times for each day. *See* ROA.431.

In his role with the NBPC, the executive board of the sector union oversees Agent Duran's union-related activity. ROA.319.

**2.    In the Days Before the Incident, the Union President Directs Agent Duran to Collect Donated Supplies and Refreshments.**

During the pandemic, a local Republican women's group was "good enough" to collect and "donate supplies to agents," such as "hand sanitizer and stuff like that." ROA.343-344. A day or so before the incident in question, a member of the group contacted the president of the sector union, Jonathan Anfinsen (i.e., Agent Duran's de facto union supervisor), to ask if Anfinsen could meet the group at the union offices on December 2. ROA.344. Anfinsen was unavailable to receive the donations because he was scheduled to be on leave. ROA.344-345. Agent Duran agreed to take responsibility for letting the local Republican women's group into the office on December 2 at around 4:00 pm. ROA.345-347.

The donated items included supplies that would assist Border Patrol in the performance of their official duties during the pandemic. *See* ROA.345. The donated items also included cookies, Gatorade, peanuts, and other refreshments. ROA.225.

Agent Duran understood that he was "supposed to be" at the union hall at 4:00 pm "to receive" the donations and put them in the union hall. ROA.224-225. As he testified, Agent Duran understood that it was his "responsibility to have met . . . [t]he women delivering the cookies and stuff for the agents." ROA.223. And as he had done with previous donations received from other Republican women's groups (e.g., Dallas,

5

San Antonio, San Angelo), Agent Duran planned to later distribute the donations "to the different [Border Patrol] stations in Del Rio." ROA.223, 225.

### 3.     Agent Duran, Running Late, Rushes to the Union Hall, Strikes Barrier with His Truck Exiting the Station, and Takes Off.

Agent Duran started work at home the day of the incident, "doing union work," at around 6:00 am. ROA.206, 219. Beginning around 2:00 pm that afternoon, Agent Duran drove to the Border Patrol station to complete his mandatory overtime work. ROA.208-209.

As he entered the Border Patrol station, he noticed people outside filming the gate, which was unusual. ROA.220. There were about five or six people around a pickup truck parked on the side of the street near, but not blocking, the exit gate "with cameras." ROA.406. They were with "Blaze News Media," ROA.407, and the group included Plaintiff–Appellant Tami Barrier.

At some point on or after 4:00 pm, Agent Duran left the station to drive to the union hall, although he "was running late." ROA.223. At about that same time, the union president (Anfinsen) received a call or text message from the Republican women's group indicating they were at the union hall, but nobody was there. ROA.347. Anfinsen called Agent Duran, saying: "Hey, they are there. Are you on your way"? *Id.* Agent Duran responded and indicated "he was on his way already." *Id.* As Anfinsen

testified, Agent Duran "didn't start driving that direction because I called him"—Agent Duran was "just running a little bit late." *Id.*

Meanwhile, Barrier was part of the group "film[ing] and document[ing] the outside of" the Del Rio Station. ROA.75. At the shift change, two Border Patrol supervisors went outside the exit gate to "monitor the situation" with the film group "because it was the end of shift and agents were leaving," to "make sure that they were not in an area that would impede the flow of traffic of agents coming and going," and to make sure that as the gates were opened, "they weren't trying to get in to take pictures inside that Federal compound." ROA.412-413.

Barrier "was standing near the entrance of the Del Rio Station" when Agent Duran "stopped his vehicle near [Barrier], then accelerated the vehicle as it headed towards [Barrier]" and struck her with his pickup truck. ROA.75. Agent Duran continued driving without stopping. *Id.*

According to Agent Duran, he "gassed it" leaving the exit gate to avoid the film crew. ROA.239.

A Border Patrol supervisor was standing nearby when the incident occurred. ROA.413-414. Although he was not looking in the direction of the collision, he heard "someone screaming that, 'Hey, he hit her. He hit her.'" ROA.414. When the supervisor walked outside the gate to investigate, he was told, "One of your guys hit

this lady." *Id.* When he spoke to Barrier, she said, "He hit me with his truck." *Id.* The supervisor watched the accident on a member of the group's cell phone video and "determined that it was [Agent] Duran's truck." ROA.415. Although the video did not show the collision itself, the "tires kind of lock[ing] on the pavement" was audible, and as Agent Duran took off, the sound of "screaming" followed. *Id.*

4.    **The Police and Border Patrol Supervisors Call Agent Duran Back to the Station for Questioning; After the "Brass" Huddle, They Decide Agent Duran's Conduct Was "Off Duty."**

At the union hall, Agent Duran received a call from the Border Patrol station's acting supervisor: "Hey, Bobby, the police want to talk to you." ROA.227. Agent Duran drove directly back to the Border Patrol station. ROA.226-227. When Agent Duran arrived, he was addressed by "primarily brass, like supervisors," about the accident. ROA.229. A motorcycle police officer was also there, and he asked Agent Duran questions. *Id.*

Initially, Agent Duran's supervisors told him that he would "have to write a memo." ROA.230. Then the supervisors spoke among themselves outside of Agent Duran's presence. ROA.230-231. After that huddle, they changed course and told Agent Duran "never mind" about the memo because "'[t]his [wa]s off duty' or whatever." *Id.* ("They pretty much said, 'Oh, yeah, we can't make him write a

8

memo.'"). When the supervisors told Agent Duran this was off-duty, he "looked at them, like, 'I think you're wrong.' But I wasn't going to argue with them." ROA.233.

5.    **The District Court Grants the Government's Motion for Summary Judgment, Finding That No Reasonable Factfinder Could Conclude Agent Durant Was Acting Within Scope.**

Barrier sued the United States for damages under the Federal Tort Claims Act (the FTCA), asserting her injuries were caused by Agent Duran's negligent conduct. ROA.73, 76-77. After limited jurisdictional discovery, the Government moved for summary judgment, arguing that Agent Duran was outside the scope of his employment when he struck Barrier with his vehicle. *See* ROA.99-102. The Government specifically moved invoking the "coming and going rule," which shields employers from liability for car accidents while the employee drives to and from work—unless the employee is on a special mission or errand for the employer, which (the Government argued) Agent Duran was not. ROA.100-101. The Government further argued "anything Agent Duran does with the union has nothing to do with CBP. They are two entirely separate and different things." ROA.101.

The district court granted the Government's motion, finding that no reasonable juror could conclude that Agent Duran was acting within the scope of his employment. ROA.463.

The district court entered final judgment on June 18, 2025. ROA.464. Barrier timely filed a notice of appeal on August 14, 2025. ROA.465-466.

## SUMMARY OF THE ARGUMENT

The district court's grant of summary judgment should be vacated because a reasonable factfinder could conclude that Agent Duran was acting within the scope of his employment under Texas law when his vehicle struck Barrier. The controlling question is governed by Texas's functional, objective test: whether the employee's conduct was within his general authority and in furtherance of the employer's business. On de novo review, with all reasonable inferences drawn for Barrier, the record supports—at minimum—a triable issue on scope.

A reasonable factfinder could readily conclude that Agent Duran was acting in the scope of his employment when his vehicle struck Barrier because, under Texas law, an employee's errand to acquire supplies, drinks, and snacks to distribute to the workforce furthers the employer's mission and may, therefore, fall within the scope of employment.

The district court's holding to the contrary is wrong for four principal reasons. *First*, properly analyzed, Agent Duran's errand to collect supplies, food, and drinks to distribute to other Border Patrol stations to assist in the performance of agents' official

duties falls within the "special mission" exception under Texas law.[2] ***Second***, the district court improperly resolved key fact disputes in the movant's favor on summary judgment.[3] ***Third***, the district court's binary framing—either Agent Duran's was engaged in CBP-related activities (within scope) or in union-related activities (personal)—is a false dichotomy and contrary to both Texas law and persuasive authority.[4] ***Fourth***, the district court's "representational"-conduct reasoning, rendered *sua sponte* and without the benefit of briefing, is legally incomplete and depends on facts outside the record.[5]

Moreover, the practical impact of affirming the district court's restrictive view of the scope of employment will expose Border Patrol agents (and other members of federal law enforcement) to greater personal liability for actions performed in their work capacities, which contravenes a foundational feature of the FTCA's scheme.[6]

Because the record, viewed most favorably to Barrier, readily supports the conclusion that Duran's errand served CBP's goals—and, at minimum, presents genuine disputes of material fact—summary judgment was improper.

---

[2] *See infra* Argument, Section 1.
[3] *See infra* Argument, Section 2.
[4] *See infra* Argument, Section 3.
[5] *See infra* Argument, Section 4.
[6] *See infra* Argument, Section 5.

## STANDARD OF REVIEW

This Court "reviews grants of summary judgment *de novo*, applying the same standard as the district court."[7] *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017); *see Garcia v. United States*, 88 F.3d 318, 320 (5th Cir. 1996) ("We review the scope [of employment] issue *de novo*."). Summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists only "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party." *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999). "All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party." *La. Crawfish*, 852 F.3d at 462. If the evidence viewed in the light most favorable to the nonmoving party, considered together with reasonable inferences in favor of the nonmoving party, indicates "either of the two results . . . is fairly possible," the factfinder must be permitted to "decide the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–54 (1986).

---

[7] Whether the FTCA waives the United States' sovereign immunity is jurisdictional. *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006). But where, as here, "the issue of jurisdiction is intertwined with the merits," the district court appropriately considered the matter under Rule 56, to which this Court applies de novo review. *See M.D.C.G. v. United States*, 956 F.3d 762, 768–69 (5th Cir. 2020).

## ARGUMENT

Barrier appeals the district court's decision granting the Government's motion for summary judgment because the district court erred by concluding Agent Duran was outside the scope of his employment, which precludes the United States' liability. Under the FTCA's limited waiver of sovereign immunity, the United States is liable for certain property damage and personal injuries "caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment.*"[8] 28 U.S.C. § 1346(b)(1) (emphasis added). "The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred." *Bodin*, 462 F.3d at 484. Texas law therefore applies. *See* ROA.89-90.

Under Texas law, "an employee's conduct is considered to fall within the scope of his employment if his actions were '(1) within the general authority given him; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed.'" *Bodin*, 462 F.3d at 484; *see* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Civil Pattern Jury Charges: General Negligence, Intentional Personal Torts, and Worker's Compensation* PJC 10.6 (2022) ("An employee

---

[8] It is uncontested that Duran was an employee of the United States at all relevant times. ROA.457.

is acting in the scope of his employment if he is acting in the furtherance of the business of the employer.").

Texas courts recognize the "coming-and-going" rule—that an "employee involved in an accident while going to or returning from the place of employment is generally not within the scope." *Garcia*, 88 F.3d at 321.

But this rule does not apply if the employee was on a special errand or "mission pertaining to his employers' business, in furtherance thereof and for their benefit." *Liberty Mut. Ins. Co. v. Nelson*, 178 S.W.2d 514, 515–16 (Tex. 1944). In this regard, Texas courts follow the principles articulated in the Restatement (Third) of Agency. *See Anderson v. Valdez*, 845 F.3d 580, 596 (5th Cir. 2016) (emphasis omitted) (quoting RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (AM. L. INST. 2006)). "[A]pplying this exception depends heavily on the facts and circumstances of the case," *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 136 (Tex. 2018), rendering this question ill-suited for resolution at summary judgment.[9]

1.    **A Reasonable Factfinder Could Conclude that Agent Duran's Mid-Pandemic Errand to Collect Hand Sanitizer, Drinks, and Snacks to**

---

[9] *See, e.g.*, *De Arrellano v. State Farm Fire & Cas. Co.*, 191 S.W.3d 852, 855 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("Whether an individual acts within the course and scope of employment is generally a question of fact when more than one inference may be drawn from the evidence."); *accord Kearns v. United States*, 23 F.4th 807, 813 (8th Cir. 2022) (applying Iowa law) ("[T]he scope-of-employment test is a 'fact-intensive analysis.'" (citation omitted)); *Borneman v. United States*, 213 F.3d 819, 828–29 (4th Cir. 2000) (applying North Carolina law) (observing that the scope-of-employment inquiry is "fact-bound").

**Distribute to Border Patrol Stations Across the Region Furthered the Border Patrol's Mission.**

Under Texas law, the "special mission" exception applies to travel that "involves the performance of regular or specifically assigned duties for the benefit of the employer." *Painter*, 561 S.W.3d at 139; *see, e.g.*, *Am. Cas. Co. of Reading, Pa. v. Bushman*, 480 S.W.3d 667, 675 (Tex. App.—San Antonio 2015, no pet.) (holding that a truck dispatcher who typically works in San Antonio was within course of employment during his off-duty travel to Elgin where he was sent by his employer "to train a dispatcher" and rejecting the argument "he was merely traveling to an alternate work site"). "If found to be on a special mission, [an] employee will be considered to be in the course and scope of his employment from the time that the employee commences the special mission until its termination, absent any deviation therefrom for personal reasons." *Chevron, U.S.A., Inc. v. Lee*, 847 S.W.2d 354, 356 (Tex. App.—El Paso 1993, no writ).

Texas courts have found employees within the "special mission" exception when running errands that advance the employer's interests—even indirectly—including to obtain supplies, drinks, food, or other items to support the employer's workforce. As for **supplies**, the Supreme Court of Texas in *Liberty Mutual Insurance Co. v. Nelson* held that an employee's detour to Houston "to purchase paint and paintbrushes" fell within the scope of employment because "such supplies were proper

15

and necessary for the prosecution [for his] work" as a "steel painter." 178 S.W.2d at 515–16; *see id.* at 516 (confirming the employee was within the scope of employment because "he was engaged in performing services for his employers which he was in the habit of performing with their knowledge, and which were fully approved by them"). The court reached this conclusion even though the employee lived in Houston, rejecting the employers' argument that the primary purpose of his trip was to "visit his home," *id.* at 516–17, as the employee "was on a mission pertaining to his employers' business, in furtherance thereof and for their benefit," *id.* at 515–16.

Regarding ***drinks***, the Supreme Court of Texas has held an employee within the scope of employment for an accident that occurred on a drive to work where the employee deviated from his normal route to buy ice to bring to a jobsite—even though "[i]ce for the [drinking] water was perhaps not absolutely essential to continuation of the drilling operation." *Janak v. Tex. Emp. Ins. Ass'n*, 381 S.W.2d 176, 182 (Tex. 1964). The court concluded that, on the facts of the case, "the jury was justified in concluding that ice for the water to be drunk by the employees was reasonably essential to continuation of the drilling operations, and thus that the deviation to obtain it was impliedly directed by the employer." *Id.*

As for ***food***, in *Arbelaez v. Just Brakes Corp.*, the Austin court of appeals held a brake-shop mechanic within scope when he collided with another vehicle on his way to

16

"pick up breakfast for himself, his manager, and his other co-workers at a nearby McDonald's restaurant," reasoning that the employer was "benefitted by [the employee]'s breakfast run," "albeit indirectly." 149 S.W.3d 717, 720–22 (Tex. App.—Austin 2004, no pet.). Just because the benefit did not run *exclusively* to the employer was not determinative, as the court concluded that the mechanic's "actions could still be within the course and scope of his employment." *Id.* at 722.

So too here. As in *Nelson*, Agent Duran's drive to collect supplies that would assist Border Patrol in the performance of their official duties during the pandemic, such as "hand sanitizer" and other unspecified "assorted things," ROA.345, falls within the "special mission" exception. *See* 178 S.W.2d at 515–16. After all, "such supplies were proper and necessary for the prosecution [of the] work" of the Border Patrol, especially during the pandemic, when many regions experienced significant shortages of hand sanitizer and similar supplies. *See id.* Agent Duran's errand—at the direction of the union president (Anfinsen)—to collect donated Gatorade, cookies, and other snacks to distribute to his fellow Border Patrol agents benefits the Border Patrol just as obtaining ice for drinking water, *see Janak*, 381 S.W.2d at 182, or McDonald's breakfast for brake-shop mechanics benefitted those employers, "albeit [perhaps] indirectly," *see Arbalaez*, 149 S.W.3d at 720–22.

Moreover, Agent Duran's own testimony establishes that he was not doing a

"personal favor" for Anfinsen, as the district court found. *See* ROA.462. Rather, Agent Duran was performing the same task he had done before with previous donations received from other Republican women's groups (e.g., Dallas, San Antonio, San Angelo). *See* ROA.225, 223. As before, the supplies and refreshments were not to be staged at the union hall as an amenity for the next union meeting; rather, Agent Duran planned to later drop off the donations "to the different [Border Patrol] stations in Del Rio." *Id.* In other words, Agent Duran's errand to collect donations to then distribute to Border Patrol stations throughout the Del Rio sector was part of his "regular or specifically assigned duties for the benefit of the employer." *See Painter*, 561 S.W.3d at 139; *see also Nelson*, 178 S.W.2d at 516 (finding the employee within the scope of employment because "he was engaged in performing services for his employers which he was in the habit of performing with their knowledge, and which were fully approved by them").

The record here establishes—or at least demonstrates the existence of a genuine dispute—that Agent Duran was running a special errand to advance his employer's interest at the time of the accident: leaving one workplace for another to receive and later distribute donated supplies and refreshments for CBP agents, which was an assigned task meant to support the workforce and, by extension, the CBP's mission. *See, e.g.*, ROA.355. Therefore, the district court's conclusion that Agent Duran's

18

errand to collect donations "provided no substantive benefit to CBP," ROA.462, is wrong as a matter Texas law (and common sense).

2.      **In Finding that Agent Duran "Was Not Compensated for His Trip," the District Court Erroneously Resolved Fact Disputes in the Movant's Favor.**

In ruling that Agent Duran's conduct fell outside the scope of his employment, the district court interpreted the record generously for *the movant* rather than the nonmovant. *Contra La. Crawfish*, 852 F.3d at 462 ("All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party."). First, the district court credited a declaration's averment that Agent Duran "clocked out at 3:30 pm" (per an after-the-fact timesheet generated by Agent Duran himself). ROA.453-454; *see* ROA.149 (declaration cited by the district court). Second, the district court accepted Agent Duran's testimony that he was "heading home" after his shift when his truck struck Barrier (having forgotten about the meeting with the local Republican women's group) until he was called and reminded by Anfinsen. ROA.453-454. Third, the district court noted that Agent Duran's supervisors "did not require him to submit a report about the incident" as support for the proposition that he was off duty at the time of the accident. ROA.454.

The record undermines the Government's (and the district court's) version of events. First, regarding Agent Duran's having "clocked out at 3:30 pm," ROA.453,

19

Agent Duran enters his time and attendance from notes and memory electronically on a government website on the Friday before the end of each biweekly pay period. ROA.216-218. There is no daily "punch clock" for Duran's hours with precise times, like 4:11 pm. *See* ROA.211-212, ROA.342-343, ROA.350-352. Thus, there is good reason to question the veracity of the time entered by Agent Duran electronically after the fact. The reliability and weight of those after-the-fact entries is a classic question for the factfinder to resolve with the benefit of cross-examination.[10] *See Cory v. Stewart*, 103 F.4th 1067, 1077, 1079 (5th Cir. 2024) (per curiam).

Anfinsen's testimony that Agent Duran's typical schedule ends each day at 4:00 pm, ROA.353-354, and that Agent Duran is "usually off the clock around the same time most days," ROA.352, further bolsters the theory that the "3:30 pm" clock-out time was litigation driven.

Second, Agent Duran's testimony that he was "heading home" when he struck Barrier with his truck (having forgotten about the donations errand), ROA.462, is contradicted by Anfinsen's. Anfinsen testified that after he received a message from the Republican women's group indicating they were at the union hall, but nobody was

---

[10] What's more, the sole, nonconclusory basis for the Government's off-duty theory is the testimony of a CBP agent who was not present at the time of the incident (and was, in fact, stationed in Washington, D.C. at all relevant times). *See* ROA.158; *see also* ROA.160 (stating that Agent Duran was "off duty" because "he was outside the gate" of the station when the incident occurred).

there, he called Agent Duran, saying: "Hey, they are there. Are you on your way"? ROA.347. Agent Duran responded, indicating that "he was on his way already." *Id.* As Anfinsen testified, Agent Duran "didn't start driving that direction because [he] called him"; Agent Duran was "just running a little bit late." *Id.*[11]

The notion that Agent Duran was heading home—having clocked out half an hour earlier than usual and having completely forgotten about the planned mission to the union hall—is further contradicted by Agent Duran's *own testimony*. Agent Duran testified he left the station "around 4:00." ROA.219. He further testified, "I was running late." *Id.* If his day truly ended unusually early at 3:30 pm, why did he testify he left the station around 4:00 pm? And what was he "running late" for if not the planned trip to the union hall? The district court erred by accepting the portion of Agent Duran's testimony that benefited the Government's position and by necessarily rejecting the contrary testimony. A reasonable factfinder could, and perhaps should, credit Anfinsen's testimony over Agent Duran's, particularly since Agent Duran's testimony is self-contradictory.

---

[11] To be sure, Agent Duran testified: "I completely just forgot about it." ROA.223. Agent Duran testified that he was on his way home and was redirected by the union president Anfinsen to the union hall. ROA.222, 226. But conflicting evidence is resolved in favor of the nonmovant, so Agent Duran's testimony should not have been credited on summary judgment.

Third, that Agent Duran was not required to complete an incident report is, at best, neutral or, considered in context, *supports* Barrier's version of events—that the Government declared Agent Duran's "off duty" status after the fact. Initially, Agent Duran's Border Patrol supervisors told him that he would "probably have to write a memo." ROA.230. Then the supervisors huddled and spoke among themselves outside of Agent Duran's presence. *See* ROA.230-231. After that huddle, they told Agent Duran "never mind" about the memo because he was "off duty." ROA.230-231 ("They pretty much said, 'Oh, yeah, we can't make him write a memo.'"). So initially the supervisors concluded Agent Duran's conduct was within scope, privately conferred, and then changed their minds. Thus, there are two reasonable interpretations of these events: (i) the Government's interpretation, that after appropriate deliberation, the correct position was reached; or (ii) Barrier's interpretation, that after a private huddle, the "brass" decided, for public-relations or litigation-driven reasons, Agent Duran's crash-and-dash was "off duty," requiring no report. Tellingly, in the moment, even Agent Duran disagreed with his supervisors' decision: "When they said [the conduct was off duty], I looked at them, like, 'I think you're wrong.' But I wasn't going to argue with them." ROA.233.

In sum, the record is littered with genuine fact disputes undermining the district court's conclusion that Agent Duran was off duty for the drive to the union hall.

22

Because the district court weighed the credibility of after-the-fact time entries and discounted evidence of the prearranged 4:00 pm assignment, *see Cory*, 103 F.4th at 1078, the district court's decision should be vacated.

3. **The District Court's Conclusion that "Union Activities Are Personal" Is Inconsistent with Texas Law and Persuasive Authority.**

The Government argued before the district court that Agent Duran's union and CBP activities are "two completely different things, separated by the brightest of lines." ROA.95. The district court accepted the Government's argument, reasoning that "union activities are personal." ROA.461. And because Agent Duran's drive "was at the behest of a union official . . . to perform a task for the union, not CBP," the district court found it "implausible that Duran was acting within the course and scope of his employment at CBP." ROA.462. The district court placed great weight on its conclusion that "Duran was not performing a representational function" in collecting provisions to distribute to Border Patrol stations in the region. *Id.*

The district court's formalistic reliance on bright lines, labels, and categories (like "union versus CBP" and "representational function") is inconsistent with (i) Texas's objective, functional test recognizing mutual-benefit conduct as within the scope of employment, and (ii) the consensus view of persuasive authority that union

activities furthering the employer's interest (as opposed to strikes or negotiating for higher pay or better benefits) fall within the scope of employment.

### a.     The Government's and the district court's categorical approach is inconsistent with Texas's objective, functional approach.

Under Texas law, the scope-of-employment inquiry is objective and functional, not formalistic; the ultimate question "hinges on an objective assessment of whether the employee was doing his job when he committed a tortious act," i.e., actions "in furtherance of the employer's business." *Painter*, 561 S.W.3d at 132. The Government did not meaningfully dispute before the district court that Agent Duran's provisions errand was of the same general nature as would be within the scope of his union activities for which he was principally employed; instead, the Government attempted to invent a new principle of Texas law that activities fall into one of two hermetically sealed categories: for the union or for the employer. *See* ROA.101 ("[A]nything that Agent Duran does with the union has nothing to do with CBP"). Neither the Government nor the federal courts should pronounce this new rule of state law. *See Parker & Parsley Petrol. Co. v. Dresser Indus.*, 972 F.2d 580, 589 (5th Cir. 1992) ("Federal courts are not the authorized expositors of state law . . . ." (brackets and citation omitted)).

Moreover, Texas courts recognize that an employee's task need not be purely for the employer to fall within scope; if one purpose of conduct is to benefit the employer,

24

it is of no moment that the main purpose may have been to benefit a third party (such as a union). *See Janak*, 381 S.W.2d at 180–81 (rejecting the notion that the court should "weigh the business and personal motives" of the employee "to determine which is dominant"); *Knipe v. Texas Emp. Ins. Ass'n*, 234 S.W.2d 274, 277 (Tex. App.—Eastland 1950, pet. granted) ("Where the servant is . . . within the scope of his employment, it is immaterial that he joined with this some private business or purpose of his own."), *aff'd*, 239 S.W.2d 1006 (Tex. 1951); *accord United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008) ("The appropriate 'scope of employment' . . . has been defined to include all those acts falling within the employee's . . . general line of work, when they are motivated—*at least in part*—by an intent to benefit the corporate employer." (emphasis added)). Indeed, if an act serves a dual purpose—benefitting both a third party and the employer—the conduct falls within scope if undertaken in the employer's service. *See Dictaphone Corp. v. Torrealba*, 520 S.W.2d 869, 872 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.) ("Conduct may be within the scope of employment, although

done in part to serve the purposes of the servant or of a third person." (quoting

Restatement (Second) of Agency § 236 (Am. L. Inst. 1958))).

That is so here even though Agent Duran's conduct was admittedly done in part

to serve a third party (the union). After all,

- the immediate intended beneficiaries were CBP agents;

- the trip originated at the CBP station;

- the accident occurred just outside the exit of the station;

- Agent Duran planned to distribute the donated provisions to Border Patrol stations across the region (not serve the refreshments at the next union meeting); and

- the assignment was consistent with Agent Duran's compensated official time as union steward.

Indeed, Agent Duran would not have been called upon to perform this task but for his

employment with and work for CBP. *See* ROA.384 (confirming that Agent Duran would

not have been "called to" perform this task were he not "a border patrol agent"). The

supposed "brightest of lines" separating Agent Duran's union conduct from his duties

on behalf of the Border Patrol, *see* ROA.95, is, under Texas law, anything but bright; it

is a hazy gray area (or an overlapping Venn diagram). Collecting donated provisions

26

plainly falls within the area of overlap. The United States' dual-benefit framing therefore raises, at a minimum, a triable issue of material fact.

Agent Duran's errand to receive and distribute donated supplies and snacks was plainly in furtherance of CBP's mission and, therefore, part of his federal employment (or, at the very least, incidental to it). The details of Agent Duran's federal employment in specific are telling. CBP pays Agent Duran a salary for up to eight hours per day of official union-stewardship time. *See* ROA.326. Thus, Agent Duran's official time supports the employer's labor–management obligations and workplace functioning.[12] A reasonable factfinder could, therefore, conclude that collecting supplies and refreshments for distribution to CBP agents at the direction of the union leader— within Agent Duran's union-steward workday for which his entire salary is paid by the

---

[12] The union Agent Duran belongs to—the NBPC—is the federal-sector union authorized under the FSLMRS as the exclusive representative in labor-and-workforce relations with the CBP. *See Dep't of Just. v. FLRA*, 144 F.3d 90, 91 (D.C. Cir. 1998). The FSLMRS was enacted, among other reasons, to protect "the paramount right of the public to as effective and efficient a government as possible." H.R. Rep. No. 95-1717, at 154 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2860, 2888; *see* 5 U.S.C. § 7101(b) ("The provisions of [the FSLMRS] should be interpreted in a manner consistent with the requirement of an effective and efficient Government."); *cf. Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996) (describing the "object" of the National Labor Relations Act, the statutory scheme from which the FSLMRS is derived, as "industrial peace and stability").

United States—furthered CBP's interests in effectiveness, continuity, and operations, and was therefore within his primary assigned job functions for which CBP pays him.

From a factual perspective, the Government makes no effort to explain why any supposed "bright" line of demarcation exists separating union activities from within scope conduct when Agent Duran spends *80% of his working hours* doing union-related work, *see* ROA.326, and his paycheck for that time *comes exclusively from CBP*, ROA.200. And from a legal perspective, the Government has not explained (i) what authority supports its view that the CBP and its union are hermetically sealed from one another, or (ii) why its conclusion does not run headlong into the precise relational structure Congress sought to furnish under the FSLMRS. Even Agent Duran himself could not clearly demarcate the line between his employment with CBP and his union activities. ROA.200 (Q: "[T]he Border patrol is actually your employer. But your duties overlap with the union; is that fair?" Agent Duran: "I -- That's beyond -- I mean, I don't -- I don't know how to answer that, to be honest.").

The district court's related conclusion that the donation of supplies, snacks, and refreshments benefitted the union and not CBP, ROA.462, also defies common sense: those supplies, snacks, and refreshments went to CBP employees who are *also* union members, but also to employees who are not. Agent Duran's assignment was consistent with his compensated official time as union steward and the scope of his employment.

*See* ROA.316 (describing the lead union steward's purview as the "day-to-day operations within a particular station"), 318 (stating that a union steward's charge is "to look out for the bargaining unit, for the workforce," which "encompasses a whole lot of things").

### b. Persuasive authority indicates that union activities to further an employer's interests are within scope.

As noted above, Texas appellate decisions specifically analyzing union activity for scope of employment are practically nonexistent due to Texas's right-to-work laws. *See City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 134 (Tex. 2013); *see also* ROA.461 (citing decisions from Connecticut, Minnesota, and New Jersey). Moreover, Texas courts apply the same agency principles articulated in the Restatement that courts in other jurisdictions apply. *See Valdez*, 845 F.3d at 596 (applying Texas law) (quoting RESTATEMENT (THIRD) OF AGENCY § 7.07(2)). Persuasive authority should therefore be especially beneficial in guiding the Court's decision. *See Carter v. United States*, 982 F.2d 1141, 1144 (7th Cir. 1992) ("The national government is never situated identically to private parties. Our task is to find a fitting analog under private law.").

Courts outside Texas have repeatedly held that union activities furthering the employer's interest or mission fall within the scope of employment under the mutual-benefit doctrine. *See Caterpillar Tractor Co. v. Shook*, 313 N.W.2d 503, 507 (Iowa 1981) (finding "union activity which furthers industrial peace" to be "beneficial to the

company"); *Spatafore v. Yale Univ.*, 684 A.2d 1155, 1162–63 (Conn. 1996) ("[C]ourts have held that an activity undertaken by an employee acting in his or her union capacity may simultaneously serve the interests of employee and employer."); *Jones v. Hartford Acc. & Indem. Co.*, 811 S.W.2d 516, 519–20 (Tenn. 1991) ("[A] union activity is 'in the course of employment' if the activity is of mutual benefit to the employee and the employer."); *New England Tel. Co. v. Ames*, 474 A.2d 571, 573 (N.H. 1984) ("[A] union activity may be 'in the course of employment' if it is of mutual benefit to the employee and employer." (collecting cases)).[13] And a within-scope-of-employment conclusion for union activities is further bolstered if the employer has expressly agreed to "compensate an activity" by authorizing the employee to engage in union activities "during normal working hours." *See Ames*, 474 A.2d at 574–75 (Souter, J., concurring) (writing separately "only to emphasize the significance" of the fact that the employer agreed "to pay employees" when "they bargain during normal working hours" as an especially "good reason to find mutual benefit from" such activities).

By contrast, union activities *against* the employer's interest or mission—such as organizing a strike or negotiating for higher pay, shorter hours, or better benefits—fall

---

[13] *See, e.g.*, *Mikkelsen v. N. L. Indus.*, 370 A.2d 5, 9–10 (N.J. 1977); *Perez v. Workers' Comp. Appeals Bd.*, 199 Cal. Rptr. 280, 283 (Cal. Ct. App. 1984); *Kennedy v. Thompson Lumber Co.*, 26 N.W.2d 459, 463 (Minn. 1947) (holding that a union steward's activities to avoid a work stoppage fell within scope of employment, reasoning it was in "the interests of both the employer and the employes [sic] that such work stoppage be averted").

outside the scope. *See, e.g.*, *Pac. Indem. Co. v. Indus. Acc. Comm'n*, 81 P.2d 572, 574–75 (Cal. Ct. App. 1938) (refusing to hold an employee within scope, even though injured on employer's premises, because she was "attending a union meeting from which her employer and his representatives were expressly excluded" apparently to declare "a sit-down strike" and demand "an increase in wages" or "shorter hours" as not "in furtherance of the employer's work"); *Fantasia v. Hess Oil & Chem. Corp.*, 265 A.2d 565, 566 (Bergen County Ct. 1970) (holding employee injured while picketing a lockout outside the scope, reasoning "the picketing involved here was not in the interest of the employer"), *aff'd*, 273 A.2d 402 (N.J. Super. Ct. App. Div. 1971); *Universal Cyclops Steel Corp. v. Workmen's Comp. Appeal Bd.*, 305 A.2d 757, 763–64 (Pa. Commw. Ct. 1973) ("Although the claimant was on the employer's premises when the alleged injury occurred," "attempting to participate in a strike against the employer" is not in "furtherance of the employer's business").

In this case, collecting donated supplies (hand sanitizer), drinks (Gatorade), and food (peanuts, cookies, and asserted other snacks) to distribute to Border Patrol stations throughout the Del Rio region plainly supports the Border Patrol's mission. For example, supplies like hand sanitizer assist Border Patrol agents in the performance of their official duties during the pandemic. If (by contrast) supplies, snacks, and drinks were being distributed to support striking workers or those on a picket line, then that

conduct would probably fall outside the scope of employment in any jurisdiction. *See, e.g.*, *Fantasia*, 265 A.2d at 566. But that is not the record here. Instead, the snacks and drinks collected by Agent Duran were to be distributed to the various stations in the region. Thus, Agent Duran's errand would at least indirectly support the Border Patrol's mission by sustaining agents in the field—ensuring they are fed, hydrated, and better able to endure difficult and dangerous operations against smugglers, drug and human traffickers, and cartels across rugged, remote, and unforgiving terrain.

### 4. The District Court's "Representational"-Conduct Reasoning Was Not Raised by the Parties and Depends on Facts Outside the Record.

The district court also placed great weight on the notion that Agent Duran's provisions errand was not a "representational function" for the union, meaning Agent Duran was outside the scope of his employment at the time of the incident. *See* ROA.462.

The district court's conclusion is both improper and unsupported. To start, the decision to raise the "representational function" issue *sua sponte* was neither proper nor practical. "[A]s a general rule, our system 'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (original alterations omitted) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part

and concurring in the judgment)). Raising this argument *sua sponte* runs contrary to this framework. It is not the district court's "task . . . to come up with arguments the parties should have made, but to decide the ones they make." *Crittindon v. LeBlanc*, 37 F.4th 177, 190 (5th Cir. 2022); *see, e.g.*, *D & J Invs. of Cenla, L.L.C. v. Baker Hughes, a GE Co., L.L.C.*, 52 F.4th 187, 201 (5th Cir. 2022) (Haynes, J., concurring in part and dissenting in part) ("The district court also concluded that the exception for 'authorization by an Act of Congress' applied. Importantly, neither party raised this exception nor briefed it before the district court. Accordingly, the district court violated the party presentation principle by invoking this exception sua sponte."). The Government is represented by able counsel. *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008). Thus, by pressing its representational-conduct argument, the district departed from its role as an adjudicator and entered the arena as an advocate.

Further, the district court's insertion of this argument was impractical. It drew this conclusion without the benefit of briefing, which led the district court to base its determination on an inaccurate or incomplete concept of the FSLMRS's framework. For instance, the district court never explains why an agency's interpretation of the statute would control here. *See* ROA.462. Instead, the district court deferred its judicial determination to an agency rather than, as binding precedent requires, considering the statute's plain language. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13

33

(2024). Considering and deciding such an argument—particularly when not raised, let alone briefed, by the parties—"may complicate or even thwart [the] efforts to resolve" the overarching issue. *Stanley v. City of Sanford*, 606 U.S. 46, 72 (2025) (Thomas, J., concurring in part and concurring in the judgment).

From there, the district court then drew its conclusion by (again) improperly resolving a factual dispute—that Agent Duran's actions did not qualify as "official time." *Cf., e.g.*, ROA.318 (explaining that providing "tax advice or divorce attorney recommendations" have fallen within a union steward's official responsibilities). Even Agent Duran's union supervisor—the individual who sent Agent Duran on his special mission—admitted it was debatable whether CBP would consider Agent Duran's actions compensable. *See* ROA.355 ("[F]or this situation, it would be debatable whether [CBP] would consider this an appropriate use of union time."); *see also* ROA.365 ("The [FSLMRS] allows for [union] work to be performed, and [the union] negotiated with the agency what form that takes.").

But even from the FSLMRS standpoint, the district court's conclusion is unfounded. Under the statute, an employee may be "granted official time" by agreement of the agency and the union for activities they agree are "reasonable, necessary, and in the public interest." 5 U.S.C. § 7131(d). There is *nothing* in the record demonstrating that Agent Duran's actions in his union capacity fall outside such an

34

agreement. Absent this evidence, the Government is not entitled to judgment as a matter of law on the representational-conduct issue.

**5.      A Decision Affirming the District Court's Restrictive View of the Scope of Employment Would Expose Federal Law Enforcement to Increased Risk of Personal Liability.**

"[O]ne of the FTCA's purposes" is "channeling liability away from individual employees and toward the United States." *Simmons v. Himmelreich*, 578 U.S. 621, 631 (2016); *see Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 80 (2d Cir. 2005) (Calabresi, J.) ("The FTCA's purpose is . . . to immunize [federal] employees and agents from liability for negligent or wrongful acts done in the scope of their employment."). The FTCA, along with the Westfall Act, reflect "Congress's decision "to relieve [federal] employees of the burden of defending litigation, which is both distracting and costly, and often to the detriment of government operations." *Mitchell v. Carlson*, 896 F.2d 128, 136 (5th Cir. 1990)

The district court's decision counteracts Congress's design. A decision interpreting the scope of federal employment along the United States' southern border too narrowly will subject federal law enforcement in the region to an increased risk of personal liability. Congress has deemed that prospect to be "distracting," "costly," and "to the detriment of government operations." *See id.* Affirming the district court's decision here would run contrary to the statutory scheme's insulation of federal

35

employees from the prospect of personal liability. The practical impact will be to make the jobs of federal law enforcement along the southern border even more difficult and recruiting more challenging.

*    *    *

The only way the Government can prevail at this stage is by demonstrating, as a matter of law on these facts, that Agent Duran acted "in a manner that d[id] not serve any goal of the employer." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 144 (4th Cir. 2018) (applying Virginia law). Because the summary-judgment record readily demonstrates the opposite, the district court committed reversible error.

## CONCLUSION

The Court should vacate the judgment and remand for further proceedings because a reasonable factfinder could conclude that Agent Duran acted within the scope of employment under Texas law and that the "special mission" exception applies.

Respectfully submitted,

*/s/ George M. Padis*

George M. Padis
Griffin S. Rubin
SBAITI & COMPANY PLLC
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
E: george.padis@sbaitilaw.com
E: gsr@sbaitilaw.com

Dustin R. Burrows
Ted A. Liggett
LIGGETT LAW GROUP, P.C.
3217 34th Street
Lubbock, Texas 79410
T: (806) 744-4878
F: (806) 744-4879
E: dustin@liggettlawgroup.com
E: ted@liggettlawgroup.com

*Counsel for Plaintiff–Appellant
Tami Barrier*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United Court of Appeals for the Fifth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ George M. Padis*
George M. Padis

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8,754 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2510 Build 16.0.19328.20010) 64-bit in 14-point Equity A font.

Date:  November 12, 2025

*/s/ George M. Padis*
George M. Padis